UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA DIFRANCO, as the Independent Administrator of the ESTATE OF MARCO DIFRANCO, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | 21 C 1600 |
| vs. | ) ) ) | Judge Gary Feinerman |
| CITY OF CHICAGO, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Maria DiFranco, as independent administrator of the estate of Marco DiFranco, brings this suit against the City of Chicago under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.*, and the Illinois Wrongful Death Act ("IWDA"), 740 ILCS 180/0.01 *et seq.*, alleging that the Chicago Police Department ("CPD") failed to offer Marco a reasonable accommodation, discriminated against him, and caused his death by failing at the outset of the COVID-19 pandemic to grant his request to work remotely or, alternatively, to socially distance from his coworkers. Doc. 1. The City moves under Civil Rule 12(b)(6) to dismiss the complaint. Doc. 22. The motion is granted in part and denied in part.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set

1

forth in Maria's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Maria as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Marco suffered from cystic fibrosis, a permanent and progressive lung disease, and cystic fibrosis-related diabetes. Doc. 1 at ¶ 9. At the time of his death, he was employed by the City as a CPD police officer. *Id*. at ¶ 1. Marco informed the City of his cystic fibrosis and cystic fibrosis-related diabetes when he began working for CPD in May 1998. *Id*. at ¶ 11. In 2005, Marco was assigned to the Narcotics Division, which required him to work at CPD's Homan Square facility and in the field. *Id*. at ¶¶ 12-13.

On March 9, 2020, in response to the COVID-19 outbreak, the Governor of Illinois issued a Disaster Proclamation, and on March 13, the President declared a National Emergency. *Id*. at ¶¶ 19, 21. COVID-19 can lead to "serious, long-term complications in some cases, including inflammation and clogged air sacs in the lungs, restriction of the body's oxygen supply, blood clots, organ failure, liver damage, intestinal damage, heart inflammation, neurological malfunction, and acute kidney disease." *Id*. at ¶ 15. According to the Centers for Disease Control and Prevention ("CDC"), individuals with underlying medical conditions, such as lung disease and diabetes, face an increased risk of severe illness and death from COVID-19. *Id*. at ¶ 16.

On March 19, 2020, Marco received an email from CPD's Chief Communications Officer advising all CPD employees of the CDC's guidance that individuals with "health

conditions like heart disease, diabetes, and lung disease are more likely to have serious illness" if they contract COVID-19. *Id*. at ¶ 22; Doc. 1-2 at 9. The email instructed employees who "believe[d] that [their] … medical condition places [them] at a higher risk of serious illness from COVID-19" to "contact the Medical Section of the Chicago Police Department to discuss next steps." Doc. 1 at ¶ 22; Doc. 1-2 at 9. The Medical Section oversees and approves medical and sick leaves for CPD employees. Doc. 1 at ¶ 23. The email further instructed "[s]worn [m]embers" like Marco to "have your healthcare provider provide documentation related to your condition to medical.section@chicagopolice.org," and stated that, "[o]nce your documentation is reviewed by the Medical Director, you will be contacted by Medical Services staff for instructions." *Id*. at ¶ 25; Doc. 1-2 at 9.

Less than two hours after Marco received the email, his doctor sent a letter to the Medical Section stating that Marco had cystic fibrosis and cystic fibrosis-related diabetes. Doc. 1 at ¶ 26; Doc. 1-2 at 11. The letter further stated that, "[w]ith this underlying lung condition and these co-morbidities, [Marco] is at higher risk of developing serious illness from COVID-19," and asked that he "be given the opportunity to work remotely or be provided with alternative accommodations to distance himself from others while at work." Doc. 1 at ¶ 26; Doc. 1-2 at 11.

While that request was pending, Marco was required to and did continue reporting for work at Homan Square and in the field. Doc. 1 at ¶ 27. On March 20, Marco called the Medical Section about his accommodation request and was told that someone would call him back. *Id*. at ¶ 28. He did not receive a call back that day. *Id*. at ¶ 29. On March 21, Marco called the Medical Section six times, but nobody answered his calls, and he could not leave a voicemail because the Medical Section's voicemail inbox was full. *Id*. at ¶¶ 30-31. Also on March 21, Marco emailed the Medical Section a signed "Employee Self-Certification of Medical

3

Condition" form certifying that he had a serious chronic medical condition placing him at an increased risk for contracting or suffering from complications of COVID-19. *Id*. at ¶ 32; Doc. 1-2 at 13. Later that day, a non-medical member of the Medial Section told Marco that a doctor employed by the City would review his accommodation request and contact him. Doc. 1 at ¶ 33. No City doctor contacted Marco on either March 21 or March 22. *Id*. at ¶ 34.

On March 23, Marco received a call from his commanding officer, Commander Ronald Kimble, who had learned from CPD's Human Resources Department about his accommodation request. *Id*. at ¶ 36. Kimble "berated" Marco for submitting the request and accused him of trying to draw attention to himself. *Id*. at ¶ 37. Marco explained the severity of his cystic fibrosis and cystic fibrosis-related diabetes, and said that his sister, who had the same conditions, had died after being infected by a communicable virus. *Id*. at ¶ 38. Kimble continued to berate Marco, telling him to retire or to go on disability instead of seeking medical leave or placement on "sworn medical roll," which "has a negative stigma" at CPD. *Id*. at ¶ 39. Kimble then ordered Marco to advise his sergeant, Sergeant Mark Vanek, of his conditions and of his request for an accommodation, which Marco did that day. *Id*. at ¶¶ 40-42.

After speaking to Vanek, Marco went to the Medical Section to inquire about the status of his accommodation request, as he still had not been contacted by a City doctor. *Id*. at ¶ 43. Marco was again advised by non-medical staff that a City doctor would review his request and contact him. *Id*. at ¶ 44.

From March 19 through March 27, despite his continued inquiries, Marco was not contacted by a City doctor regarding his accommodation request. *Id*. at ¶¶ 45-46. During that time, as required by CPD policy, Marco continued to report to work at Homan Square, as he had neither received information about his accommodation request nor received clearance from the

4

City to take medical leave. *Id*. at ¶¶ 45, 47. To access the Homan Square facility, Marco had to place his palm on a biometric palm scanning system, which was used by hundreds of individuals per day and was not sanitized between uses. *Id*. at ¶¶ 48-51. Marco also had to take communal elevators, in which he came into contact with individuals from other CPD departments who were not wearing masks. *Id*. at ¶ 52.

On March 28, Marco began experiencing COVID-19 symptoms. *Id*. at ¶ 53. Around the same time, he was told that three individuals with whom he had been in contact at Homan Square during the previous week had tested positive for COVID-19. *Id*. at ¶ 54. At least one other detective in the building had also tested positive. *Ibid*. The next day, on March 29, Marco tested positive for COVID-19. *Id*. at ¶ 55. Between March 29 and April 2, Marco continued to attempt to contact CPD and the Medical Section about his accommodation request, but he was ignored. *Id*. at ¶¶ 57, 59, 61. He was never contacted by a City doctor about his accommodation request, nor was his request approved. *Id*. at ¶ 60. The City and CPD did grant accommodation requests made by other officers and employees, some of which had been submitted after Marco's. *Id*. at ¶ 62.

Marco died on April 2 of COVID-related complications. *Id*. at ¶ 56. CPD classified his death as being in the line of duty. *Id*. at ¶ 58. On September 18, 2020, in her capacity as the independent administrator of Marco's estate, Maria cross-filed charges with the Illinois Department of Human Rights ("IDHR") and the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging ADA and IHRA violations. *Id*. at ¶ 5. The IDHR and EEOC sent Maria right-to-sue letters, *id*. at ¶¶ 6-7, after which Maria timely filed this suit.

## Discussion

Maria brings claims under the ADA and the IHRA for failure to accommodate and discrimination, and under the IWDA for causing Marco's death. *Id*. at ¶¶ 66-125.

### I. Maria's Ability to File EEOC and IDHR Charges

The City argues that Maria cannot pursue ADA claims on behalf of Marco's estate because Marco himself did not file an EEOC charge before his death. Doc. 22 at 14-15. In support, the City submits that "the EEOC has consistently found that estates may not file administrative charges on behalf of federal employees who die before initiating the administrative process." *Id*. at 14.

It is true that some EEOC decisions hold that "a deceased employee's estate [may not] initiate the process of exhausting a discrimination claim that the employee could have initiated while alive." *Perkins for Est. of Perkins v. Brennan*, 821 F. App'x 630, 631 (7th Cir. 2020) (citing *Estate of Krinsky v. Potter*, 2007 WL 715558 (E.E.O.C. Mar. 2, 2007), and *Estate of Anderson v. Potter*, 2003 WL 22288515 (E.E.O.C. Sept. 23, 2003)). But the Seventh Circuit held that "the EEOC's policy does not bind this court," and rejected the argument that a plaintiff cannot bring an employment discrimination charge on behalf of a deceased employee's estate. *Id*. at 631-32 (holding that the "real issue with a representative trying to initiate an administrative claim on behalf of a decedent is a failure to timely exhaust," not the decedent's failure to initiate the claim himself). It follows that Marco's failure to file an EEOC charge before his death did not preclude Maria from doing so, or from pursuing ADA claims, on behalf of his estate.

The City likewise argues that Maria cannot pursue her IHRA claims because Marco did not file an administrative charge with the IDHR before his death. Doc. 22 at 15. Neither party cites, and the court could not find, caselaw addressing whether an estate may file an IDHR charge on behalf of a deceased person's estate. There is no need to run this issue to ground at

this juncture because Maria's ADA claim will proceed, and the scope of discovery will be the same, regardless of whether the IHRA claim proceeds or is dismissed. Doc. 22 at 15 n.11 (City acknowledging that "ADA and IHRA claims are governed by the same standards and can be analyzed together"). The City may renew at summary judgment its argument regarding Maria's ability to file an IDHR charge on behalf of Marco's estate.

## II. ADA/IHRA Failure to Accommodate Claims

The ADA provides that a covered employer shall not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Under the ADA, "discriminat[ion]" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." *Id*. § 12112(b)(5)(A). Thus, "the ADA requires employers to reasonably accommodate the limitations of its disabled employees." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).

"To establish a claim for failure to accommodate, a plaintiff must show that: (1) []he is a qualified individual with a disability; (2) the employer was aware of h[is] disability; and (3) the employer failed to reasonably accommodate the disability." *Id*. at 797. The City challenges only the third element of Maria's claim. Doc. 22 at 15. Pertinent here, "[a]n unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate his disability." *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020). "Whether a particular delay qualifies as unreasonable necessarily turns on the totality of the circumstances, including, but not limited to, such factors as the employer's good faith in attempting to accommodate the disability, the length of the delay, the reasons for the delay, the nature, complexity, and burden of the accommodation requested, and whether the employer offered

alternative accommodations." *Ibid*. The same principles govern Maria's IHRA claim. *See Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654, 659 (7th Cir. 2013) ("When analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to analogous federal claims.").

The City argues that CPD's failure to respond to Marco's request for accommodation in the ten days between his initial request on March 19 and his hospitalization on March 29 cannot be deemed an "unreasonable" delay because courts have found that longer delays unaccompanied by bad faith are not unreasonable, and Maria does not allege that CPD acted in bad faith. Doc. 22 at 16-17 (citing *Cloe v. City of Indianapolis*, 712 F.3d 1171 (7th Cir. 2013), and *Jay v. Intermet Wagner*, 233 F.3d 1014 (7th Cir. 2000)). That argument is unpersuasive, at least at the pleading stage, because Maria's allegations give rise to a plausible inference that the City's delay in responding to Marco was unreasonable given the circumstances presented by the COVID-19 pandemic and also was in bad faith. *See McCray*, 966 F.3d at 622 (distinguishing *Cloe* and *Jay* on the ground that "th[o]se were summary judgment cases that presented developed factual records to the court," noting that those cases do not "purport[] to say that a delay of any particular duration will invariably be reasonable regardless of the surrounding circumstances," and holding that "whether a particular delay is reasonable turns on the facts of a given case").

As noted, determining whether an employer's delay in responding to an accommodation request is unreasonable requires considering the "totality of the circumstances," including the employer's good faith, the length and reasons for the delay, and the complexity of the requested accommodation. *Id*. at 621. Here, the complaint alleges that the Medical Section failed to respond to Marco's request for an accommodation despite his repeated and diligent efforts to follow up on his initial request, Doc. 1 at ¶¶ 29-31, 34, 45-46, 57, 59-61; that the City was aware

8

that COVID-19 posed serious health risks to individuals with lung disease and diabetes, *id*. at ¶ 22; Doc. 1-2 at 9; that the City knew that Marco suffered from those conditions, Doc. 1 at ¶¶ 9, 11, 26, 32; that Commander Kimble berated him for requesting an accommodation, *id*. at ¶¶ 36-39; and that the City managed in the pertinent time frame to grant other employees' accommodation requests, *id*. at ¶ 62. Given these allegations, the court cannot hold on the pleadings that the City's failure to take action on Marco's accommodation request within ten days was not unreasonable. *See McCray*, 966 F.3d at 621-22 (rejecting an employer's argument that an eleven-month delay could not be unreasonable as a matter of law, where the complaint alleged that the employer failed to respond to the employee's requests until he filed an EEOC charge and that the employer immediately provided the requested accommodation to other employees).

Accordingly, Maria's ADA and IHRA failure to accommodate claims may proceed.

**III.    ADA/IHRA Discrimination Claims**

As noted, the ADA provides that a covered employer shall not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "To establish disability discrimination, a plaintiff must prove that (1) []he is disabled within the meaning of the ADA, (2) []he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and (3) []he suffered from an adverse employment action because of h[is] disability." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838-39 (7th Cir. 2012). An adverse employment action must be "'materially' adverse to be actionable," *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001), and includes "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities," *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013). To establish that an adverse employment action was

9

taken "because of" the plaintiff's disability, the plaintiff must show that, "'but for' his disability, he would have been able to access the services or benefits desired." *A.H. by Holzmueller v. IHSA*, 881 F.3d 587, 593 (7th Cir. 2018).

Maria submits that Marco was "treated differently than other CPD Officers" in two ways: first, CPD granted other employees' accommodation requests but not Marco's; and second, Kimble berated Marco for requesting an accommodation. Doc. 25 at 16. Neither states a claim for ADA discrimination.

Maria's failure to accommodate claim is "separate and distinct under the ADA from one of disparate treatment because of a disability." *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 897 (7th Cir. 1999). The essence of the failure to accommodate claim is that Marco *asked* to be treated differently based on his disability—to be allowed to work remotely or socially distanced from his coworkers—but that CPD failed to grant his request. The factual allegations underlying that claim cannot be repackaged as a discrimination claim because their crux is that CPD did *not* treat Marco differently based on his disability. *See Torzewski v. COSCO Shipping Lines N. Am. Inc.*, 414 F. Supp. 3d 1143, 1150 (N.D. Ill. 2019) (holding that the plaintiff's "discrimination claim is [not] duplicative of his failure to accommodate claim" because the claims were "based on factually distinct allegations"). Nor can Maria's allegation that Kimble berated Marco for requesting an accommodation support a discrimination claim, as a single hostile call from a supervisor does not rise to the level of a materially adverse employment action. *See Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 704 (7th Cir. 2001) (holding that a supervisor's comments that an employee "had to go" and requests that the employee return the key to her office, though "unpleasant," were "too petty and tepid to constitute a material change

10

in the terms and conditions of [the employee's] employment," as the supervisor's threats "never materialized" and did not prevent the employee from performing her job duties).

Accordingly, Maria's ADA and IHRA discrimination claims are dismissed.

### IV. IWDA Claim

The City argues that Maria's IWDA claim is precluded by Section 22-307 of the Illinois Pension Code. Doc. 22 at 6-14. Section 22-307 states in pertinent part:

> Common law rights barred. Whenever any city or village enacts an ordinance pursuant to [Division 3 of the Pension Code], *no common law right to recover damages* against such city or village for injury or death sustained by any policeman or fireman while engaged in the line of his duty as such policeman or fireman … shall be available to any policeman or fireman who is covered by the provisions of such ordinance, or to anyone wholly or partially dependent upon such policeman or fireman, or to the legal representative of the estate of such policeman or fireman, or to anyone who would otherwise be entitled to recover damages for such injury or death.

40 ILCS 5/22-307 (emphasis added). By its terms, Section 22-307 bars "common law" actions for damages stemming from a police officer's death in the line of duty if the officer is covered by a municipal ordinance enacted pursuant to Division 3 of the Pension Code.

The Municipal Code of Chicago ("MCC") includes an ordinance, enacted under Division 3 of the Pension Code, providing for the "payment of allowances of money to the family or dependents of any policeman or fireman of the City of Chicago in case he is killed or fatally injured while in the performance of his duties." MCC § 3-8-010. The City argues that this ordinance triggers Section 22-307's preclusion provision, thus barring Maria's IWDA claim. Doc. 22 at 6-14. Maria responds that Section 22-307 precludes only common law rights of action, not statutory claims, including those brought under the IWDA. Doc. 25 at 5-10.

Under Illinois law, "[t]he cardinal rule of statutory interpretation, to which all other rules are subordinate, is to ascertain and give effect to the legislature's intent. And the best indicator of that intent is the language used, given its plain and ordinary meaning." *Walker v. Agpawa*, __

11

N.E.3d __, 2021 IL 127206, ¶ 23 (Ill. Aug. 26, 2021) (citation omitted). Section 22-307 is titled "Common law rights barred," and it expressly precludes only "common law right[s] to recover damages." 40 ILCS 5/22-307. It follows that Section 22-307 reaches only common law claims, not statutory claims like those arising under the IWDA. *See People v. Legoo*, 178 N.E.3d 1110, 1116 (Ill. 2020) ("No rule of construction authorizes this court to declare that the legislature did not mean what the plain language of the statute imports, nor may we rewrite a statute to add provisions or limitations the legislature did not include.") (quotation marks omitted).

The City retorts that Section 22-307's legislative history demonstrates that it was meant to cover statutory claims as well. Doc. 22 at 8-12. That argument fails to persuade. As an initial matter, legislative history cannot overcome unambiguous statutory language. *See Policemen's Benevolent Lab. Comm. v. City of Sparta*, __ N.E.3d __, 2020 IL 125508, ¶ 22 (Ill. Nov. 19, 2020) ("Because we find the statutory language plain and unambiguous, we may not resort to the legislative history or other aids of statutory construction."). In any event, the legislative history cited by the City does not advance its cause.

As both parties note, Doc. 22 at 8, Doc. 25 at 6, before Section 22-307 was amended in 1997, it was titled "Common law *or statutory* rights barred," and it provided that "no common law *or statutory* right to recover damages … shall be available … ." 1997 Ill. Legis. Serv. P.A. 90-525 (Senate Bill 194) (emphasis added). The 1997 amendment deleted the words "or statutory" in Section 22-307's text and title and added two sentences clarifying that the statute does not prevent police officers in municipalities with fewer than 500,000 people from receiving payouts under various worker compensation provisions. *See ibid*. The fact that the General Assembly specifically deleted the words "or statutory" confirms that Section 22-307, as it currently stands, is correctly read to apply only to common law claims, not to statutory claims.

*See People v. Hare*, 519 N.E.2d 879, 883 (Ill. 1988) ("[A] statutory amendment gives rise to the presumption that the new legislation was intended to effect a change in the law as it formerly existed."). The decisions cited by the City for the contrary result—*Lohman v. Bemis*, 680 N.E.2d 819, 820-21 (Ill. App. 1997), *Nelson v. Industrial Commission*, 713 N.E.2d 119, 122 (Ill. App. 1999), *Village of Winnetka v. Industrial Commission*, 597 N.E.2d 630, 633 (Ill. App. 1992), and *McNamee v. Federated Equipment & Supply Co.*, 692 N.E.2d 1157, 1161 (Ill. 1998)—all address the pre-amendment version of Section 22-307 and thus are inapposite.

Finally, the City argues that the legislative debates surrounding the 1997 amendment demonstrate that "the legislators' sole intentions behind the change was not to lift the bar on Wrongful Death Act claims against employers, but to give 'downstate' firefighters and police officers access to remedies under the W[orkers'] C[ompensation] Act." Doc. 22 at 9-11. Regardless of what legislators may have said in those debates, the fact remains that the General Assembly deleted the words "or statutory" from Section 22-307's text, thus removing all statutory claims from Section 22-307's ambit. It is the statutory text itself, not statements in the legislative record, that fix a statute's meaning.

Accordingly, the Illinois Pension Code does not preclude Maria's IWDA claim.

## Conclusion

The City's motion to dismiss is granted in part and denied in part. The ADA and IHRA discrimination claims are dismissed without prejudice, and Maria has until March 21, 2022 to file an amended complaint that repleads them. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). If Maria does

not replead those claims, the dismissal will convert automatically to a dismissal with prejudice, and the City shall answer the surviving portions of the complaint by April 4, 2022. If Maria does replead, the City shall file a responsive pleading by April 11, 2022, though it should not again move to dismiss the ADA and IHRA failure to accommodate claims or the IWDA claim based on grounds rejected in this opinion.

March 7, 2022

_____
United States District Judge